**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00299 (RBW)** |
| **v.** | : | |
| | : | |
| **MARIPOSA CASTRO** | : | |
| **AKA IMELDA ACOSTA,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mariposa Castro to sixty days' incarceration and $500 restitution.

## I.     Introduction

"Mariposa Castro" is the social media moniker of defendant Imelda Acosta (hereinafter "Castro"). Although she returned to her Washington, D.C. hotel room after attending the "Stop the Steal Rally" on January 6, 2021, Castro "couldn't stay in the room [while] watching in the news what is happening." After being told by other guests at her hotel that "Vice President Pence was a traitor," Castro decided, "I'm not taking this! NO," and ventured a mile-and-a-half to the besieged grounds of the U.S. Capitol Building. She eagerly joined the January 6, 2021 assault on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

In videos eventually viewed nearly 5,000 times, Castro broadcast live to hundreds of Facebook viewers her presence on restricted Capitol grounds for at least 47 minutes, repeatedly announcing her intent to "break in" and then documenting her unlawful entry into a conference room of the U.S. Capitol Building through a smashed-out window.  Castro transmitted the violent siege of the Lower West Terrace and documented the ransacking of Senate Terrace Mezzanine Room 2 ("Room ST-2M") from inside and outside the Capitol Building.  Addressing her followers as she was forced from the Capitol grounds at sunset, Castro exulted at the rioters' success:

> As Trump says, "the best is yet to come."  It was a pretty long one.  We showed them.  We showed them all.  Showed this one.  War just started.  It's just the beginning.  As Trumps says, "the best is yet to come."  It was so ugly.  It got ugly in there.  It got really ugly.  I'm literally by myself.  They told me not to be on my own.  To find a crowd.  And I'm by myself.  That just shows how brave I am.  If I can do this, you guys can do this.

Castro, the former owner of a San Francisco Bay Area yoga and tea shop, pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), that is, Parading, Demonstrating, or Picketing in the Capitol Building.

As explained herein, a sentence of sixty days' incarceration is appropriate in this case because: (1) the defendant rushed from her hotel room to the besieged Capitol after witnessing the unrest on television; (2) filmed and commented on the rioters' assault on the Lower West Terrace for nearly 30 minutes; (3) repeatedly stated her intent to break into the Capitol; (4) climbed through a smashed-out window to trespass inside the ransacked Room ST-2M; (4) broadcast to her social media followers her entry and unlawful presence in the Capitol Building, exclaiming, "we're going in the Capitol.  We're in!  We're inside the Capitol House!  We got inside the Capitol!"; (5) remained on restricted Capitol grounds and continued filming herself while fellow rioters retrieved objects from Room ST-2M  to be used as weapons against law enforcement officers; (6) continued to glorify the riot and advocate violence as she left the Capitol Grounds, even stating to her

followers, "we're coming, this is war," when another individual walking with her threatened, "traitors will be shot.  Pence, we're coming"; and (7) has shown no apparent remorse for her self-proclaimed "brave" misconduct on January 6, 2021.

Even if she did not personally engage in violence or property destruction during the riot, before entering the Capitol Building on January 6, Castro encouraged and celebrated the violence of that day and essentially called upon her social media followers to join her in a "civil war."  Not satisfied with her own unlawful conduct, Castro broadcast it through social media, encouraging her followers, "if I can do this, you guys can do this."

The Court should consider that Castro's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to encourage their fellow rioters, overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for her actions, together with that of so many others, the riot likely would have failed to disrupt the certification vote.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.")  Here, Castro's participation in a riot that actually succeeded in halting the Congressional certification combined with her celebration and endorsement of the violence and property destruction on that day, her claim of bravery, and her insinuation of future violence, render a period of incarceration – rather than just probation or home detention – both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol contained within Castro's Statement of Offense.  *See* ECF 35 at 1-3.  As the Court knows,

a riot cannot occur without rioters, and each rioter's actions – from the most sedate to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  The government first provides background on the Lower West Terrace, where Castro broadcast for over 45 minutes – estimated to be between 4:00 p.m. and 5:00 p.m. – on January 6, 2021.

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers.  Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One  of  the  most  violent  confrontations  on  January  6  occurred  near  an  entrance  to  the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway, which is marked with a red circle in the exhibit below, is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  Exhibit 1; "Inauguration at the U.S. Capitol," Architect of

the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Exhibit 1[1]**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of

doors was closed and locked, and members of Congress who had fled from the rioters were

sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers

from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the

doorway and guarding the entrance.  Many of these officers had already physically engaged with

the mob for over an hour, having reestablished a defense line here after retreating from an earlier

protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the

---

[1] The window to ST-2M, which was shattered on January 6, 2021, is marked with a yellow
circle.  As described below, this where Castro entered the Capitol Building.

law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this – and I don't think even you know this – but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight." Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle.  We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process.  My fellow officers and I were committed to not letting any rioters breach the Capitol.  It was a prolonged and desperate struggle.  *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government.  Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life.  The bravery he and others showed that day are the best examples of duty, honor, and service.  *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the

lives of others, including potential harm to members of Congress.

With that backdrop we turn to Castro's conduct and behavior on January 6, 2021.

*Mariposa Castro's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Mariposa Castro, her husband, and an associate traveled from California to Washington, D.C., to attend a January 6 rally near the Ellipse. ECF 35 at ¶ 8. After attending the former President's rally, all three returned to their hotel room. *Id.* at ¶ 9. Inspired by news reports about individuals amassed at the Capitol, Castro left her hotel room and proceeded to the Capitol. *Id.* at ¶ 10. Castro explained her motivation to a friend via text, apparently after she returned to her hotel room on the night of January 6, 2021: "I couldn't stay in the room well [sic] watching in the news what is happening[,] I'm not taking this! NO[.]" Exhibit 2.



**Exhibit 2**

Castro, who was staying at the Embassy Suites hotel near the Washington Convention Center, traveled around a mile-and-a-half and through a throng of rioters who had entered restricted Capitol grounds. Castro arrived at the Capitol Building at or about 3:48 p.m. ECF 35 at ¶ 10. At a time estimated to be around 4:13 p.m., she recorded a 157 second video from a

vantage point near the LWT tunnel and doorway area described above.  Exhibit 3.[2]

From that location and at that time, Castro would have seen and heard some of the most extreme violence of the hours-long battle between the rioters and law enforcement officers who were defending the Capitol Building.  During the time that Castro was nearby, officers were pepper sprayed, assaulted with numerous makeshift weapons, and even beaten and tasered by the mob.  Fifty-one seconds into her 4:13 p.m. recording, among a loud crowd of rioters, Castro exclaims, "we're breaking in! We are breaking in!  We're doing this.  We're breaking in, right?  … We're taking our house back.  This is our Capitol.  We're taking it back.  No more bullshit!  That's it." *Id.* at 0:51 – 1:08.  In the same recording, when informed that rioters have broken into the Capitol through a window, an unknown individual cautions, "I know people are going to be destructive." *Id.* at 1:42 – 2:00.

Castro then filmed a 30-minute Facebook Live segment, streamed by hundreds of her social media followers, from near the same location.  At the end of that segment – over 30 minutes after she first told her viewers that she was "breaking in" – Castro approached the window to Room ST-2M, the first Capitol window just north of the tunnel into the Capitol Building.  *See* Exhibit 1.  Room ST-2M is a conference room on the Senate side of the U.S. Capitol Building used by staffers to assist the functioning of the U.S. Senate and therefore is a sensitive space, not open to the public.  In Exhibit 4, Room ST-2M is marked by an arrow, immediately to the left of the tunnel:

---

[2] The government intends to play audio from that recording, as Exhibit 3, at Castro's sentencing hearing.



**Exhibit 4**

As she arrives at Room ST-2M, Castro exclaims, "we're getting in!"  *See* Exhibit 5 at 0:00

– 0:02.[3]   A megaphone-wielding rioter[4] asks for "strong patriots … to fill the house," and

encourages the crowd, "let's go."  *Id.*  at 0:14 – 0:18.  Castro responds loudly, "let's go! "let's go!

Let's go in!  Let's go!"  *Id.* at 0:18 – 0:22.  The rioter then asks for "angry patriots to fill the house,"

as Castro tells her social media followers, "we're going in."  *Id.* at 0:38 – 0:41.  As Castro begins

to enter the building, the megaphone-wielding rioter requests "military men" and "gas masks …

as protection for our patriots," the crowd nearby chants "traitor" toward the officers defending the

---

[3] The government intends to play a portion of Castro's 30-minute livestream, as Exhibit 5, at her sentencing hearing.  Exhibits 5-1, 5-2, 5-3, and 5-4 are still photographs from Exhibit 5.

[4] The individual has since been identified as Gina Bisignano, who is charged in case number 1:21-cr-00036(CNJ).  *See https://www.justice.gov/opa/page/file/1356556/download*

tunnel, an individual talks about retrieving his "billy club."  *Id.* at 0:53 – 1:11.  Castro then is helped through a hollowed-out window into Room ST-2M.  *Id.*





**Exhibit 5-1**                    **Exhibit 5-2**

Castro narrated her unlawful entry for her social media followers and thousands more who would watch later.  She exclaimed, "I'm going in.  I'm going in the Capitol.  We're in!  We're inside the Capitol house.  We got inside the Capitol!"  *Id.* at 0:58 – 1:28; ECF 35 at ¶¶ 11-12. Castro knew at the time she entered the U.S. Capitol that she did not have permission to enter the building.  *Id.* at ¶ 14.  She recorded for just a few seconds while inside Room ST-2M.

 

**Exhibit 5-3**                    **Exhibit 5-4**

Costa later explained to law enforcement officers that the people inside the Capitol were prepared and had equipment with them as if they had planned on breaking in.  Livestream video taken by another individual in Room ST-2M confirms that the ransacking Castro observed while inside the U.S. Capitol Building included furniture being overturned and destroyed to be used as makeshift weapons and shields to fight law enforcement and battering rams to gain access to rooms deeper in the Capitol Building.  *See* Exhibit 6.[5]  Nearby rioters in tactical gear sought the floorplan of the room and vowed to "push forward."  *Id.* at 0:00 – 0:05.  The room appeared ransacked, with glass littering the carpet and furniture and paperwork strewn about.  *Id.* at 0:00 – 1:30.  Speaking through a megaphone into the room, a woman[6] encouraged fellow rioters to drop into the room

---

[5] The government intends to play a portion of that livestream, as Exhibit 6, at Castro's sentencing hearing.  Exhibits 6-1, 6-2, 6-3, and 6-4 are still photographs from Exhibit 6.

[6] The woman has since been identified as Rachel Powell, who is charged in case number 1:21-cr-00179(RCL).  *See* https://www.justice.gov/opa/case-multi-defendant/file/1364896/download

beneath through a broken glass window.  *Id.* at 0:34 – 1:00.  She explained, "people should probably try to coordinate together if we're going to take this building" and directs the rioters to break another window.  *Id.*  Other rioters pressed further into the suite of offices.

**Exhibit 6-1**



**Exhibit 6-2**



**Exhibit 6-3**





**Exhibit 6-4**

A short time later, a furniture leg removed from Room ST-2M was used as a weapon by another rioter[7] against the police line in the LWT archway, just a few feet away.  *See* Exhibit 7; Exhibit 7-1.  Similarly, a tabletop from ST-2M made its way into the hands of rioters and was thrown against the police line.  *See* Exhibit 7-2.

 

**Exhibit 7-1**                                    **Exhibit 7-2**

---

[7] The rioter has since been identified as Timothy Desjardins, who is charged in case number 1:21-mj-00663-ZMF.  *See*  *https://www.justice.gov/usao-dc/case-multi-defendant/file/1459011/download*

Castro stated to law enforcement officers that she was inspired to leave the Capitol Building only because the chemical spray in the air was so thick – apparently not because of the rioters around her ransacking the conference room and plotting "to take this building." Castro then resumed her Facebook Live broadcast. *See* Exhibit 8.[8]  When she got outside, just steps from the Capitol Building, Castro triumphantly announced to her audience, "I'm back again!" as other rioters retrieved additional objects through the broken window of Room ST-2M to be used as weapons against the officers amassed in the tunnel. *Id.* at 0:00 – 1:00; Exhibit 8-1.



**Exhibit 8-1**

At one point, Castro stands next to a door that was ripped from its hinges and pillaged from Room ST-2M, streaming herself and narrating for nearly 5,000 viewers what is happening around her as a rioter yells, "we got the door!" and another yells, "start the bitch on fire!"  *Id.* at 0:55 – 1:02.

---

[8] The government intends to play a portion of that livestream, as Exhibit 8, at Castro's sentencing hearing.  Exhibits 8-1, 8-2, 8-3, and 8-4 are still photographs from Exhibit 8.





**Exhibit 8-2**                    **Exhibit 8-3**

Castro tells her viewers that it was time to leave because, "this is too much." *Id*. From her later statements, it is clear that what Castro is referring to as "too much" is not the looting and violence of the mob surrounding her, but the munitions being deployed by law enforcement to disperse the crowd and protect themselves, the Capitol Building, and the civil servants who remain inside.

After being driven away from the Capitol Building by law enforcement officials, Castro was defiant. As evening dawned on Washington, Castro streamed a conversation with a passerby:

Passerby:     It's a war. It's a civil war.
Castro:       It is. It's a civil war.
Passerby:     Backed the blue all fucking summer and this is how they treat us? Fuck the
              blue. This is our country and we're taking it back.
Castro:       We're taking it back. We're not a communist country.
Passerby:     Nope, this is America.
Castro:       We're not a communist country.
Passerby:     Our home.

16

| Castro: | Yeah. |
|---|---|
| Passerby: | Fuck you. |
| Castro: | Get them out of here. |
| Passerby: | Traitors will be shot.  Pence, we're coming. |
| Castro: | We're coming. |
| Passerby: | We're coming. |
| Castro: | This is war. |
| Passerby: | It's war. |
| Castro: | This is war. |

*Id.* at 10:27 – 10:50.



**Exhibit 8-4**

Walking away from the Capitol building, and ironically still draped in a peace flag, Castro

reminisced and encouraged her followers:

> Share all my videos.  I just did a live one.  That one was a pretty long one.  Share
> them.  Share them all.  Share this one.  War just started.  It's just the beginning.  As
> Trump says, "the best is yet to come."  It was a pretty long one.  We showed them.
> We showed them all.  Showed this one.  War just started.  It's just the beginning.
> As Trumps says, "the best is yet to come."  It was so ugly.  It got ugly in there.  It
> got really ugly.  I'm literally by myself.  They told me not to be on my own.  To
> find a crowd.  And I'm by myself.  That just shows how brave I am.  If I can do
> this, you guys can do this.

Exhibit 8 at 13:20 – 14:23.

*Conduct After January 6, 2021*

After the attack on the Capitol, Castro promised to expose "what happened on the 1-6-2021" to her social media followers.



Mariposa Castro
I will be making a video in a while to talk about what happened yesterday from DC Washington. I'm ok but I can feel aches n pains. I was bleeding from my nose this morning.
I'm going back out to DC Capital. This is not over!!!
I have sooooo much proof of what happened on the 1-6-2021. I will post all these vids. I might be taken out of FB but it will be worth it!!! Everyone needs to watch what happened. I made it out but for a while I thought I was going to die.

1d    Like                                    6

**Exhibit 9**

However, Castro's two Facebook accounts were suspended soon thereafter.

Castro voluntarily agreed to an interview with the FBI on February 9, 2021, after her arrest. During the interview, Castro falsely stated that the people being violent were Antifa and Black Lives Matter, not Trump supporters. This statement obviously is inconsistent with her statement at around 5:15 p.m. on January 6, 2021, that, "we showed them, we showed them all. War just started. It's just the beginning."

*The Charges and Plea Agreement*

On January 21, 2021, Mariposa Castro was charged by complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On February 9, 2021, she was arrested in California. On April 13, 2021, Castro was charged by four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On November

24, 2021, she pleaded guilty to Count Four of the Information, charging a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  By plea agreement, Castro agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Castro now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As recognized by the Plea Agreement and the U.S. Probation Office, Castro faces up to six months of imprisonment and a fine of up to $5,000.  Castro must also pay restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, 18 U.S.C. § 3553(a) identifies the factors the Court must consider in formulating a sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  As described below, the Section 3553(a) factors weigh in favor of a term of imprisonment.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As he or she entered the Capitol, each rioter would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

This Court must assess Castro's individual conduct on a spectrum.  In determining a fair and just sentence, the Court should look to a number of critical factors, including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Castro personally engaged in violence or destruction, she would be facing additional charges – likely felonies – and more significant penalties associated with that conduct.  The absence of violent or destructive acts in this case therefore is not a mitigating factor, nor does it meaningfully distinguish Castro from most other misdemeanor defendants.  The defendant's

lack of violence and property destruction is the only reason she was permitted to plead guilty to a Class B misdemeanor rather than a felony.

Castro did not simply exercise her First Amendment rights or engage in legitimate political discourse on January 6, 2021.  Instead, having attended the "Stop the Steal" rally and returned to her hotel room, Castro "watch[ed] in the news what is happening" at the Capitol, was told that former Vice President Pence was a "traitor," and ventured a mile-and-a-half to join the mob, arriving at or about 3:48 p.m.  Even if it took Castro an hour to reach the Capitol from the Convention Center neighborhood, she would have already seen on television the extensive violence that occurred as the rioters overtook the police protecting the Capitol Building and made their initial breach into the building at 2:13 p.m.

And Castro did not travel alone – she brought her social media followers, nearly 5,000 of them, who viewed her live that day or soon thereafter.  She documented her own criminal conduct and that of other rioters, imagining herself at the forefront of a civil war, and encouraging those at home who did not participate in the January 6 riots to join in, stating "if I can do this, you guys can do this."

When Castro got to the Capitol – arriving at 3:48 p.m. and departing the Grounds around 5:15 p.m., she witnessed nearly an hour of the assault on law enforcement officers by rioters attempting to physically breach the U.S. Capitol Building by pushing through a line of dozens of law enforcement officer who were arrayed in the tunnel leading from the Inaugural stage into the passageways under the building.  With tear gas in the air and broken glass on the carpet, Castro scrambled into the U.S. Capitol Building, triumphantly telling her followers "We're inside the Capitol House!  We got inside the Capitol!"  Even knowing at the time she entered the U.S. Capitol

Building that she did not have permission to enter the building, she paraded, demonstrated, or picketed, violating 40 U.S.C. §5104(e)(2)(G).

Metadata from Castro's phone suggests that she spent no more than 15 minutes inside the Capitol Building, likely much less. But even if she was inside for just a few minutes, Castro left the Capitol Building because of the heavy scent of chemicals in the air, not a sudden change of heart. She then livestreamed right outside Room ST-2M, observing other rioters' unlawful conduct for at least three more minutes, until tear gas used by the police caused her to flee from the Capitol Grounds at sundown. Even if Castro expresses contrition during her sentencing hearing, on January 6 and in the weeks thereafter, she showed none. Instead, Castro's statements on social media during and after January 6 show a lack of remorse. She exulted, "we showed them. As Trump says, 'the best is yet to come.'" Castro even suggested future violence, claiming "it's a civil war. We're taking it back … get them out of here. We're coming. This is war." When a passerby ominously warned, "traitors will be shot. Pence, we're coming." Castro echoed that threat, "we're coming."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Mariposa Castro has no adult criminal convictions. She apparently has a stable home life and, since 2004, has shared been married to Randy Acosta, who supports Castro financially. *See* PSR ¶ 47.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the democratic process."[9]  In most cases, including misdemeanor cases, this factor supports a sentence of incarceration for offenses arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).  A sentence short of imprisonment would not reflect the seriousness of Castro's conduct or promote respect for the rule of law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

A sentence of incarceration would dispel Castro and her accomplices of the notion that her conduct on January 6 shows bravery.  Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

In many Capitol riot cases, the demands of general deterrence weigh in favor of incarceration.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  The government requests sixty days' incarceration here because the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  Castro exercised her First Amendment rights when she attended the rally on the Ellipse.  What she did after she left her hotel room – proceeding across town during the D.C. winter in order join a riot-in-progress and trespass in the Capitol Building and – was different.  And it is important to convey to future potential rioters – especially those who intend to improperly influence the democratic process – that their actions will have consequences.  This is particularly true, where, as here, the defendant has a throng of social media

followers whom she told, "if I can do this, you guys can do this."  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Mariposa Castro's criminal conduct on January 6 – starting with her trek to the Capitol, continuing through her lengthy livestream of the Capitol riots and climb through a broken window into the Capitol Building, and concluding with her exultant statements on social media cheerleading the violence and destruction she had just witnessed – clearly demonstrate the need for specific deterrence.  As dusk settled over the Capitol, with tear gas still filling the air, Castro spoke of civil war.  She vowed to continue the violence and destruction and noted to her thousands of viewers that they could follow in her footsteps.  The next day, she told her Facebook followers, "This is not over!!!"  Even weeks later, when speaking with the FBI, she falsely blamed "Antifa" and "Black Lives Matter" for the lawlessness of her fellow rioters even though she had personally witnessed extensive violence on the Lower West Terrace, had a close-up view of the mob gathering weapons for its continued attack on law enforcement, and herself gloated at the end of the riot, "*we* showed them all."

To the extent that Castro feels any remorse for her actions of January 6, 2021, she has not expressed so publicly.  The government acknowledges that Castro accepted responsibility early by entering into this plea agreement, and she should be credited for doing so.  On the other hand, Castro's failure to acknowledge the dangers and violence of January 6, 2021, her spreading of false information relating to the attack on the Capitol, and her lack of remorse underscore the need for specific deterrence in this case.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as this case, to assaults on law enforcement officers, to conspiracy to corruptly interfere with Congress.[10]  Each offender must be sentenced based on her individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not become the default.[11]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed,

---

[10] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[11]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

It certainly is true that Castro is one of the first defendants to be sentenced for a misdemeanor committed in the Lower West Terrace area of the Capitol of the United States Capitol.  But the government submits that the Court should consider the factors present, and sentences imposed, in the cases of Jennifer Ryan, Karl Dresch, Erik Rau, and Derek Jancart.

Jennifer Ryan, like Castro, pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).  *See United States v. Ryan*, No. 1:21-cr-00050 (CRC), Tr. 10/4/2021.  Ryan was also a social media influencer who enthusiastically participated in the attack on the U.S. Capitol while sharing her unlawful conduct with her online followers.  *Id.* at 43.  Like Castro, Ryan learned of the unrest at the Capitol while inside her hotel room and ventured out to "storm the Capitol."  *Id.* at 42.  Ryan, too, entered the U.S. Capitol Building, documented her exploits on social media, and observed broken glass while inside.  *Id.* at 43.  Judge Cooper found significant that, when Ryan left her hotel room, she "knew that this was no ordinary peaceful protest."  *Id.* at 42.  He explained,

> [Y]ou knew it when you got to the Capitol when the riot was still going on.  You passed by a broken window.  You heard the alarms going off, and you smelled tear gas; so I don't think you could have missed the fact that this was no peaceful protest and that there was violence going on around you.

*Id.* at 43 (statement of Judge Cooper).  Like Castro, Ryan spent relatively little time inside the Capitol Building due to chemical irritants deployed by law enforcement.  *See id.* at 41.  There are

a handful of differences: Ryan had a troubled family history, had a history of dated misdemeanor convictions, attempted to profit from her conduct on January 6, and her social media views numbered in the millions, rather than thousands.  *See United States v. Ryan*, No. 1:21-cr-00050(CRC), ECF 48 at 1, 4, 5.  She appears to have witnessed far less violence and property damage than did Castro.  For those reasons, the government recommended, and Judge Christopher R. Cooper sentenced Ryan to, two months' jail time. *Id.*, ECF 56.

Karl Dresch also pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).  *See United States v. Dresch*, No. 1:21-cr-00071 (ABJ), Tr. 8/4/21.  Like Castro, Dresch entered the Capitol Building and then relied on Facebook to convey satisfaction and enthusiasm regarding the events of January 6, 2021, gloating that "we the people took back our house and those traitors know who's really in charge." *Id.* at 13.  Dresch, too, expressed an awareness of the officers' use of tear gas to repel the rioters. He was in the Capitol Building about 25 minutes – more time than Castro – and, unlike Castro, has an extensive criminal history.  *Id.* at 21-23 & 31-32.  However, Dresch did not livestream his entry and presence in the Capitol and does not appear to have witnessed the property damage and violence that Castro saw.  Dresch "was peaceful, he was respectful; he didn't break anything, he didn't hurt anyone[.]" *Id.* at 28 (statement of Judge Berman Jackson).  The government sought, and Judge Amy Berman Jackson imposed, a sentence of 6 months' imprisonment (which already had been served). *Id.* at 23, 26.

Finally, the Court may wish to consider the case of co-defendants Erik Rau and Derek Jancart. *See United States v. Rau*, No. 1:21-cr-00148(JEB), Tr. 9/29/21; *United States v. Jancart*, No. 1:21-cr-00467(JEB), Tr. 9/29/21.  Both individuals pleaded guilty before Judge James E. Boasberg to 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building.  Like Castro, Rau and Jancart left their hotel and traveled to the Capitol only after learning that it had been

"breached." Rau Tr. at 3. They were not simply "following the crowd," which Judge Boasberg

found "very significant." Jancart Tr. at 23 (statement of Judge Boasberg). Judge Boasberg

explained to Derek Jancart,

> [Y]ou went back to your hotel and only left the hotel to come back to the Capitol
> when you heard the Capitol was breached. That you weren't following the crowd.
> That you were there to assist once you learned that. And that's significant. I believe
> that where you were, and the others with whom you were with outside the Capitol,
> there is cheering, encouragement and incitement.

*Id.*

> Sentencing Erik Rau, Judge Boasberg explained,

> The fact is … returning from the hotel – you could have stayed in the hotel and if
> you were curious, you could have watched on T.V. what happened, as the rest of
> us were doing who were horrified. You didn't have to walk out, you didn't have to
> go back to the Capitol. You didn't have to encourage other people and yell at the
> police about what was happening that day. Again, the encouragement and the
> incitement of other people is what led to the violence; that nobody on his own would
> have been merely as likely to assault people, destroy property and engage in such
> antisocial activities if there weren't plenty of others egging them on.

Rau Tr. at 17 -18 (statement of Judge Boasberg).

Both co-defendants were recorded screaming, "we made it up to the Capitol … we have

the police surrounded! We have you surrounded!" *United States v. Rau*, No. 1:21-cr-00467(JEB),

ECF 13 at 3-4. They also entered the Capitol Building – progressing as far as the Speaker's

conference room with Rau entering that secured space for 15 seconds and Jancart photographing

it from outside. *Id.* at 6. There also are some differences. Although they posted images to

Facebook, *id.*, it does not appear that Rau and Jancart livestreamed or shared their exploits beyond

their own Facebook friends. Rau and Jancart entered the Capitol through a door, rather than a

hollowed-out window. *Id.* at 2. Although they walked past shattered glass, *id.* at 5, there is no

indication that they observed prolonged violence or property damage like Castro. While only

spending about 15 seconds in a House conference room (clearly less than Castro), the co-

defendants were inside the Capitol for around 40 minutes and left only when directed by law enforcement. *Id.* at 7-8; Jancart Tr. at 24 ("You were there for 40 minutes. You went all the way to the Speaker's conference room. And you did post that the rioters wanted to let the politicians know they could get this far any time they wanted. These are all important facts to me") (statement of Judge Boasberg); Rau Tr. at 18. Unlike Castro, Rau deleted texts and photographs related to January 6. Jancart brought a gas mask and two-way radio and had a military background. *See* Rau Tr. at 6; Jancart Tr. at 22-23. Both Rau and Jancart were sentenced to 45 days of imprisonment. *United States v. Jancart*, No. 1:21-cr-00148-JEB, ECF 33; *United States v. Rau*, No. 1:21-cr-00467(JEB), ECF 21.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

sentence.  Balancing these factors, the government recommends that this Court sentence Mariposa

Castro to sixty days' incarceration and $500 in restitution.   Such a sentence protects the

community, promotes respect for the law, and deters future crime by imposing restrictions on his

liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:   */s/ Jordan A. Konig*
**JORDAN A. KONIG**
Texas Bar No. 24055791
Trial Attorney, Department of Justice
On Detail to the U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-7917 (v) / (202) 514-5238 (f)
Jordan.A.Konig@usdoj.gov