```
1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2
       - - - - - - - - - - - - - - - x
3      THE UNITED STATES OF AMERICA,
                                         Criminal Action No.
4                   Plaintiff,          1:21-cr-00299-RBW-1
                                         Wednesday, February 23, 2022
5      vs.                               9:04 a.m.

6      MARIPOSA CASTRO,

7                   Defendant.
       - - - - - - - - - - - - - - - x
8

9      _____

10                  TRANSCRIPT OF SENTENCING HEARING
            HELD BEFORE THE HONORABLE REGGIE B. WALTON
11                   UNITED STATES DISTRICT JUDGE
       _____
       APPEARANCES:
12     For the United States:      JORDAN ANDREW KONIG, ESQ.
                                   U.S. DEPARTMENT OF JUSTICE
13                                 Civil Trial Section
                                   Northern Region
14                                 P.O. Box 55
                                   Ben Franklin Station
15                                 Washington, DC 20044
                                   (202) 305-7917
16                                 jordan.a.konig@usdoj.gov

17     For the Defendant:          ELITA C. AMATO, ESQ.
                                   ATTORNEY AT LAW
18                                 2111 Wilson Blvd.
                                   Suite 8th Floor
19                                 Arlington, VA 22201
                                   (703) 522-5900
20                                 amato.law@comcast.net

21
       Court Reporter:            Lisa A. Moreira, RDR, CRR
22                                Official Court Reporter
                                  U.S. Courthouse, Room 6718
23                                333 Constitution Avenue, NW
                                  Washington, DC  20001
24                                (202) 354-3187

25
```

```
 1                   P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  We have United States vs.
 3    Mariposa Castro, Criminal Matter 21-299.
 4            Counsel, please identify yourselves for the
 5    record.
 6            MR. KONIG:  Good morning, Your Honor; Jordan Konig
 7    for the United States.
 8            THE COURT:  Good morning.
 9            MS. AMATO:  Good morning, Your Honor; Elita Amato
10    on behalf of Ms. Acosta, who is present.
11            THE COURT:  Good morning.
12            Ms. Acosta, would you please identify yourself.
13            THE DEFENDANT:  Yes, good morning; Imelda Acosta.
14            THE COURT:  And we have somebody here from
15    probation also.
16            THE PROBATION OFFICER:  Good morning, Your Honor;
17    Crystal Lustig on behalf of the probation office.
18            THE COURT:  Good morning.
19            This matter is here today for a sentencing.  In
20    preparation for the sentencing I did review the plea
21    agreement again, also the final presentence report dated
22    February 2, 2022, also the government's sentencing
23    memoranda, also the defendant's sentencing memorandum, also
24    the response by the defendant to the government's sentencing
25    memoranda along with four exhibits that were submitted by
```

1       the defense.

2                   Is there anything else I should have reviewed in

3       preparation for the sentencing, Government Counsel?

4                   MR. KONIG:  I don't believe so, Your Honor.

5                   THE COURT:  Defense Counsel?

6                   MS. AMATO:  No.  Thank you, Your Honor.

7                   THE COURT:  Government Counsel, it appears that

8       there are no objections to the presentence report; is that

9       right?

10                  MR. KONIG:  That's correct.

11                  THE COURT:  And it appears that there's still an

12      issue regarding Paragraph 4 of the presentence report from

13      the defense's perspective.  Is that correct?

14                  MS. AMATO:  The Court's indulgence.

15                  Your Honor, I understand why it was included,

16      because the plea -- I think Paragraph 4 just repeats

17      what was in the plea agreement.  But I think we're all on

18      the same page, that she is not eligible for supervised

19      release -- well, supervised release is not an option because

20      it is a Class B misdemeanor that she has pled guilty to.

21                  THE COURT:  And so you're saying that's a petty

22      offense; is that right?

23                  MS. AMATO:  Correct, Your Honor.

24                  THE COURT:  So does the government have a position

25      as to whether a split sentence would be appropriate?  I've

1    had this issue up before, whether -- in the context of these

2    type of pleas, whether a split sentence would be

3    appropriate.  I know Judge Kotelly ruled that it is not

4    because of the offense that she pled guilty to being a petty

5    offense, then you could not impose a prison sentence along

6    with a period of probation.

7              MR. KONIG:  Your Honor, I believe the office's

8    position on that, which was set forth in the case in front

9    of Judge Kotelly, is that a split sentence is possible.  We

10   have not requested one in this case, and we're not asking

11   the Court for a split sentence in this particular case, but

12   I think it's the position of the U.S. Attorney's Office that

13   such a split sentence is possible.

14              Though I think Ms. Amato is correct, that

15   supervised release is not available in a Class B

16   misdemeanor, to which Ms. Acosta pleaded guilty here.  But a

17   split sentence of probation and incarceration, I think the

18   office's position is that it is possible under law.

19              THE COURT:  Okay.  Well, we'll address that if I

20   decide that that will be the appropriate way to go once I

21   hear from counsel.

22              Okay.  Then, Government Counsel, you may proceed

23   with your allocution.

24              MR. KONIG:  Thank you, Your Honor.  And I'm going

25   to try and let Ms. Acosta's words speak for themselves more

1      than my own.  This is a rare case in which the defendant has

2      videotaped and narrated the offense to which she's pleaded

3      guilty, and there's also independent video and independent

4      pictures that generally establish what happened.  So I'm

5      going to try and be brief in my own argument and rely some

6      on the sentencing memorandum that we submitted as Docket No.

7      40.

8           I'm going to concentrate on the nature and

9      circumstances of this offense and to some extent on the need

10     for the sentence the Court imposes to reflect the

11     seriousness of the offense, promote respect for the law,

12     deter her and others, and also avoid unwarranted sentencing

13     disparities.  Those are the 3553(a) factors I think the

14     Court should concentrate on when it applies the law and

15     sentences Ms. Acosta.

16          So what this defendant did in this case and what

17     she pleaded guilty to is set forth in her statement of

18     offense.

19          On January 6th, she had gone to a rally on The

20     Ellipse.  She'd seen the former president speak.  She went

21     back to her hotel room, and she watched TV.  And she saw on

22     TV what was going on down at the Capitol, and so she left

23     the comfort of her hotel room, which we now know was The

24     Embassy Suites over near the convention center, and she

25     walked across town to the Capitol space, the inaugural space

1        which had been set up for the inauguration.

2                And according to the statement of offense and the

3        statements of Ms. Acosta, she arrived at about 3:48 p.m.

4        And we know, from the Facebook Live videos she took and from

5        videos that were on her phone, that she left around sunset.

6        I think the last video that shows her in the parking lot not

7        far from where Your Honor sits today was about 5:15 p.m.  I

8        think it was 5:13 p.m.

9                And in that time she was at the Capitol she

10       recorded herself.  She said, starting at about 4:13 at the

11       earliest, that she intended to go into the Capitol Building,

12       and then she did that at what we're guessing is about 4:45

13       p.m.  She went into a window that had been broken out, and

14       she went into a conference room of the Senate, which we

15       refer to as ST-2M.  It's the Senate Terrace Mezzanine Room

16       2.  She -- and then she was -- according to her own

17       statements, it appears that she was driven out by tear gas

18       in the air.

19               She continued to record herself as she left the

20       Capitol grounds.

21               She's not being sentenced today for offenses that

22       she didn't do.  She pleaded guilty to this one misdemeanor,

23       and so she should not be given credit for crimes she did not

24       commit.

25               It is true she did not kick furniture, like the

1   people around her, and pass it to people who were attacking

2   officers in the tunnel area nearby.  It is true that she did

3   not commit property damage.  She did not herself assault

4   officers, she did not breach the Senate floor, and she

5   should not be given credit for her failure to commit those

6   crimes.  And the government is not intending to have her

7   sentenced based on the fact that she was chanting, that she

8   had political views, that others perpetrated violence.

9          But the videos that we're going to show today and

10   the statements we relied on in our sentencing memo show this

11   defendant's state of mind.  It shows what she was doing,

12   shows what she was seeing on January 6, 2021.  It's part and

13   parcel of the 3553(a) factors.  It's the way the Court can

14   make sure that this defendant is sentenced appropriately for

15   what she did, and it shows that when she says she never put

16   into action anything she said, that's not correct.

17          She said, starting at 4:13 p.m., that she was

18   going to go into the Capitol Building, and then she did

19   that.

20          And I should also note that it wasn't just --

21          THE COURT:  One moment.  Let me interrupt you for

22   a minute because I forgot to do something before we started.

23          Ms. Acosta, she has a right to an in-court

24   hearing, and if she wants that, then we would delay the

25   hearing so that she could actually come to Washington and be

1    present in the courtroom for the hearing.  And I assume,

2    based upon that request having not been made, that there is

3    no request for an in-court hearing, but I do need to have a

4    waiver on her part.

5            So, Counsel, have you talked to your client about

6    her right to actually be in court for the sentencing?

7            MS. AMATO:  I have, Your Honor.  We've spoken

8    about her right to come to Washington, D.C., to be in court

9    for her hearing.  As Your Honor knows, she lives out of

10   state, and she is agreeing to proceed in the manner that we

11   are proceeding as of now.

12           THE COURT:  Ms. Acosta, as I said, you do have a

13   right to actually come to Washington and be in the courtroom

14   for your sentencing, but you can waive or give up that right

15   in light of the pandemic that we're experiencing, the virus.

16   But it's really your prerogative as to whether you want an

17   in-court hearing or whether you're willing to proceed

18   remotely, as we're proceeding now.

19           THE DEFENDANT:  This is fine, Your Honor.  This is

20   okay, as we're proceeding right now.

21           THE COURT:  Very well.

22           Sorry, Government Counsel.  You may proceed.

23           MR. KONIG:  Thank you, Your Honor.

24           So as I was saying, this defendant, Ms. Acosta, is

25   not being charged -- she's not being sentenced based on

1    anything but her own conduct.  And it is worth noting that

2    although she was in the Capitol Building relatively briefly,

3    that in this case it's pretty clear that she was violating

4    the law for longer than that.

5           You know, whether the U.S. Attorney's Office

6    chooses to prosecute or not, there was a perimeter around

7    the Capitol Building on January 6th.  And in particular the

8    inaugural space that she was standing on and around for, you

9    know, one would guess nearly an hour -- she said she got

10   there at 3:48, and we think she left at about 5:15 -- that

11   was restricted, and in a lot of cases I think it's fair to

12   say the defendants are going to argue that they didn't know

13   that that area was restricted.

14          And I don't know that the U.S. Attorney's Office

15   is prosecuting people for being in restricted areas and not

16   entering the Capitol, but in this instance Ms. Acosta was

17   watching TV.  She'd gone back to her hotel room.  And so

18   it's fair to assume that what she saw on TV was individuals

19   breaching that perimeter.  And it's also fair to assume that

20   anyone would know that the inaugural stage is not a site to

21   be freely stood on.

22          But, you know, so that's -- but that's background.

23          The Court also should consider unwarranted

24   sentencing disparities.  The United States has addressed

25   that at some length in its sentencing memorandum at Page 28

1   and following that, and I'm not going to further argue that,

2   but I would say that a sentence of 60 days imprisonment

3   here, which we're asking for, would be consistent with the

4   cases of Jennifer Ryan, Karl Dresch, Erik Rau, and Derek

5   Jancart.

6          The defendant submitted a statement and a pleading

7   on Monday of this week where she raises the case of Rasha

8   Abual-Ragheb.  That's Case No. 21-cr-43 in front of Judge

9   Nichols.  In that case the government recommended 30 days

10  incarceration, and the Court imposed a 60-day home

11  confinement sentence and three years of probation.  The

12  government believes that a disparity with that sentence is

13  warranted.

14          In that case some messages that the defendant

15  posted were posted before and after, but not during, the

16  riots of January 6th.  That defendant went directly from the

17  rally to the Capitol Building and claims that she didn't see

18  any of the destruction, that she didn't -- that she followed

19  the crowd in, which, as the chief judge said last week, is

20  not an offense of culpability, but it is a factor that the

21  Court can consider, that this defendant had time to think

22  about leaving her hotel room and joining what she'd seen on

23  TV.

24          The defendant in that case was -- went in through

25  a door, not a broken window, and she had two minor children

1    of which she was the sole custodian.  That defendant also,

2    since her sentencing to home confinement, has gone on media.

3    She was on an Internet show called The Tamara Scott show

4    just last month and told the host that she was not guilty of

5    the offense she pleaded guilty to.

6         She wanted to make it clear that she didn't trust

7    the justice system, and that she was -- she -- in her own

8    words, that defendant said that she was hoping the judge

9    would remember the oath that he took, but obviously this is

10   not the land of the free.  And she said that she begged the

11   judge, but this shows how evil they are because she was sent

12   to home confinement during the Christmas season.  And she

13   said in her -- this other defendant, who was sentenced to

14   just home confinement, said that 90 percent of the people

15   who entered guilty pleas were forced to enter their guilty

16   pleas because they don't trust the justice system.

17        So I think that in that instance, the 3553(a)

18   factors, you know, might have called for the sentence the

19   United States requested, and certainly the sentence that was

20   imposed does not appear to have deterred that defendant.  So

21   the government believes that it would be warranted for the

22   Court to impose a sentence disparate with Ms. Abual-Ragheb.

23        So I'm going to move on with what happened with

24   this defendant on January 6th.  We know that she went to the

25   rally at The Ellipse.  The former president spoke starting

1   at about noon.  And we know, from the public record, that by

2   12:53 rioters began to overwhelm law enforcement at the

3   Capitol.

4           We know that at 1:00 p.m. the former vice

5   president released a letter stating that he was not going to

6   undo the election, and that by 1:30 the Capitol Police were

7   overwhelmed and forced to retreat up the steps of the

8   Capitol into a tunnel that is where the President-Elect

9   comes down during the inauguration.  I believe another judge

10  of this court referred to it as the Lady Gaga tunnel.  It's

11  where the President-Elect comes down.

12          The stage is set up for the inauguration, and by

13  about 1:35 the officers from the West Front had to retreat

14  into that tunnel.

15          And I'm going to begin to share my screen, and

16  it -- can the Court see this well?

17          THE COURT:  I don't -- yes, I can see it.  I don't

18  see any images though.

19          MR. KONIG:  Can you see the presentation?

20          THE COURT:  Yes.

21          MR. KONIG:  Okay.  So Exhibit 1, which we

22  submitted with our sentencing memorandum, shows -- can you

23  see where I'm pointing, Your Honor?

24          THE COURT:  Yes.

25          MR. KONIG:  That is the inaugural stage, and that

1    is the tunnel to which I was referring.

2            And I'm now pointing to the viewers' left.  The

3    first window is the window in through the Senate Terrace

4    Mezzanine Room 2, and by about 1:35 the officer retreated

5    into that tunnel.

6            In Ms. Castro's sentencing memorandum she claims

7    that she turned on the TV and began watching the events that

8    occurred at the Capitol when she got back to her hotel, and,

9    partly out of curiosity and partly because she wanted to

10   live stream it, she decided to leave the comfort of her

11   hotel and walk to the Capitol.

12           She also said that she was downstairs in the

13   lobby, and she was talking to some people, and she said she

14   wants to see things firsthand.  We know from her interview

15   with the FBI that she also had heard -- and in her words or

16   in their words -- that the former vice president was a

17   traitor.  And later that night she stated to a friend by

18   text, "I couldn't stay in the room well watching in the news

19   what is happening.  I'm not taking this!  No."

20           So she did say that she was curious, and she did

21   say that she wanted to live stream.  She said she wasn't

22   taking it, and she assumedly was going to act.  And so she

23   went from her hotel, which is about 10th Street, Northwest,

24   between K and New York Avenue, and she went to the Capitol

25   Building, and she arrived about 3:48 p.m.  That would have

1    been after -- and I should say -- I think I got the math

2    wrong.  It was 2:35 p.m. when the officers were forced to

3    retreat into the tunnel, not 1:35 p.m.

4          And 2:12 p.m. was when the first rioter entered

5    the Capitol Building through a broken window, and I would

6    submit that the defendant would have known that by the time

7    she left her hotel room.

8          So she arrived at about 3:48, and by 4:13 she

9    takes a video, and I'm going to -- I have to switch what I'm

10   sharing.

11         Thank you for your patience, Your Honor.

12         Okay.  And this is a video that was taken on

13   defendant's phone at 4:13 p.m.  It is a video.  You'll see

14   on the top of the screen from ST-2M with the gentleman with

15   the red hat in front of it, and then the tunnel area with

16   somebody with a gray sweatshirt in front of that.  And this

17   is the scene that we first see on Ms. Acosta's phone, and

18   she says during this that, "We're breaking in.  We're

19   breaking in.  We're doing this.  We're taking our house

20   back.  This is our Capitol."

21         And somebody else said at the end of this, "I know

22   people are going to be destructive."

23         (Video playing)

24         MR. KONIG:  Your Honor, that was one of the longer

25   clips I'll be playing.  I'm now going to be playing, in

1    hopefully quick succession, a handful of quick notes which

2    are about a minute long from a 30-minute-and-seven-second

3    video that Ms. Acosta filmed right in the essentially 30

4    minutes before she entered the Capitol and while she was

5    entering the Capitol.

6         I'll note for the record that because this came

7    from Facebook, for some reason the images appear reversed;

8    so it's going to actually look like she comes from the right

9    side of the Capitol when we believe she was, as this image

10   showed, coming from the left entering ST-2M.

11        In the first video I'm going to share,

12   Ms. Acosta -- it's about four minutes and 50 seconds into

13   the video, so our guess is around 4:20, 4:25 -- she states

14   that "We're taking back the Capitol.  We're not giving up.

15   We're breaking in."

16        (Video playing)

17        MR. KONIG:  And the next clip, about ten minutes

18   and 55 seconds into the 30-minute-and-seven-second video,

19   Ms. Acosta hears someone being tasered.  And the Court will

20   be able to hear the sound of the taser, and she actually

21   comments, "That was a taser."

22        She wouldn't have known it at the time, but we now

23   know that that was an officer, a Metropolitan Police

24   Department officer, being tasered with his own weapon, which

25   caused him to have a heart attack.  He was pulled into the

1    crowd of rioters and tasered.

2              This is the next clip.

3              (Video playing)

4              MR. KONIG:  The next clip, at about --

5              THE COURT:  Before you move on, I couldn't

6    discern -- I could only discern her saying "1776," but what

7    was she saying before that?

8              MR. KONIG:  She was -- I know she said afterwards,

9    "We're not stopping."  If I -- was it just before the

10   chanting, Your Honor?

11             THE COURT:  No, it was when she first started

12   speaking, and then there's some other -- there were some

13   other things that she was saying.

14             MR. KONIG:  If Your Honor will give me the

15   indulgence, I'll briefly replay it, and I'll state out loud

16   what I hear.

17             So that's her saying, "Fight for Trump."

18             And that would be the taser.  And she would have

19   said -- she said something like "That was a taser" or

20   "Someone was tasered."

21             THE COURT:  Okay.

22             MR. KONIG:  In the next clip, which is about 12

23   minutes and 54 seconds into this video, you can see

24   Ms. Acosta with her peace flag, and past her flag

25   individuals are passing a large wooden object.  We know now

1      that that object and objects like it were used to attack the

2      officers in the tunnel.  Ms. Acosta says -- rioters are

3      yelling at the officers protecting the Capitol in this clip,

4      and Ms. Acosta says, "We're passing some sticks so we can

5      break windows and go in."

6                  (Video playing)

7                  MR. KONIG:  About ten minutes later in this video,

8      at 23 minutes and 23 seconds, she again says, "Let's go in.

9      Let's go in.  We're going in.  We're taking back the

10     Capitol."

11                 The next clip a few minutes later, 26 minutes and

12     55 seconds, is when some of the worst fighting was occurring

13     between the rioters and the law enforcement officers

14     protecting the Capitol Building, and Ms. Acosta comments,

15     "Oh, my God, they're hitting people.  They're hitting

16     people.  Oh, my God.  Fight, fight, fight."

17                 So the next clip's going to be about two and a

18     half -- it's a little over two minutes, but it is the final

19     few minutes as Ms. Acosta's entering the Capitol Building.

20                 When she says, in her sentencing memo or

21     subsequent sentencing memo, that she never put into action

22     anything she said, this video, starting at 27 minutes and 47

23     seconds in, shows that she actually did put into action her

24     statements and her statements over the prior 25 minutes, 27

25     minutes, where she said at least four times that she was

1    going to enter the Capitol, and then she did.

2            In this video, which we discussed in our

3    sentencing memorandum, she says, "We're going in.  We're

4    getting in."  And another rioter asks for strong patriots to

5    build a house and encourages the crowd, "Let's go."

6            Ms. Acosta responds, "Let's go.  Let's go.  Let's

7    go in.  Let's go."

8            The rioters then asked for angry patriots to fill

9    the house.  Castro tells the social media followers, "We're

10   going in," and then she enters the building.  And you can

11   hear the other rioters.  One is speaking of his billy club

12   as Ms. Castro is helped through the hollowed out window into

13   the Capitol Building.

14           And this would be on Exhibit 4.  There's an arrow.

15   She is being helped through this window that I am pointing

16   to next to the tunnel, which is right here.

17           (Video playing)

18           MR. KONIG:  Ms. Acosta did not film for long

19   inside the Capitol, which, I submit, suggests she did not go

20   into the Capitol for recording purposes.  She wasn't there

21   to show to her Facebook viewers what was going on.

22           But she went in because she wanted to go in.  It

23   was her choice.  She says to go in not as a reporter or a

24   citizen reporter, but because she wanted to go in, as she'd

25   been saying for approximately 30-something minutes before

1    she went in.

2         I should note for the Court that it wasn't

3    inevitable that she would go into a room that was just a

4    conference room unconnected to the rest of the Capitol.  We

5    don't know what her intent was, what she wanted to do, if it

6    was in the room that the former vice president was in or the

7    Speaker of the House or the Senate Chamber itself.  We don't

8    know what she went to see or how long she would have stayed

9    had it been a different room or had there not been tear gas

10   in the air.

11        Exhibit 6 we describe in the sentencing

12   memorandum, which is a video that is an open source video

13   that shows Ms. Acosta inside the room and shows what she

14   would have seen while she was inside that room at ST-2M.

15        (Video playing)

16        MR. KONIG:  Ms. Acosta exited room ST-2M and began

17   to record herself on Facebook Live again for 16 minutes and

18   44 seconds ending at sunset.

19        And we have just three more clips from that longer

20   video:  one outside of the Senate conference room on the

21   inaugural stage area; one as she was walking away from the

22   Capitol Building; and one when she finally made it to the

23   parking lot.

24        In the first one she tells her viewers that it was

25   time to leave because this is too much, and you can see her

1   talking to rioters who apparently had been sprayed by pepper

2   spray, I submit, in the tunnel area, which was right next to

3   where she was and where a lot of intense fighting still was

4   going on.  In fact, Exhibit 7-1 shows a table that actually

5   shows up in the video we just saw in Exhibit 6.  It was

6   taken from that room and a tabletop that was taken from that

7   room to attack the officers in that tunnel area.  This is

8   directly outside of Room ST-2M.

9        (Video playing)

10       MR. KONIG:  And in this you can see the rioters

11  are taking a door from ST-2M and putting it outside for the

12  other rioters.  And in a moment you'll see Ms. Acosta.

13       (Video playing)

14       MR. KONIG:  In the next clip, which we cited in

15  our sentencing memorandum, a passerby speaks of war, and

16  Ms. Castro agrees that it's a civil war.  The passerby says,

17  "We're taking it back," and Ms. Castro says, "We're taking

18  it back.  We're not a communist country."

19       The passerby says, "Nope, this is America."

20       Ms. Castro says, "We're not a communist country."

21       A little further she says, "Get them out of here."

22       The passerby says, "Traitors will be shot.  Pence,

23  were coming."

24       Ms. Castro says, "We're coming."

25       The passerby says, "We're coming."

1          Ms. Castro says, "This is war."

2          The passerby says, "It's war."

3          And Ms. Castro says, "This is war."

4          This is about a 30 -- about a 20-second clip.

5          (Video playing)

6          MR. KONIG:  Ms. Acosta, in her sentencing

7    memorandum, says when peace could not be obtained she left.

8    I submit that this next clip shows her state of mind as she

9    was leaving the Capitol grounds on January 6, 2021.  In it

10   she says, "The war just started.  It's just the beginning.

11   The best is yet to come.  The war just started.  It's just

12   the beginning.  It was so ugly.  It got ugly in there.  It

13   got really ugly.  I'm literally by myself.  That just shows

14   how brave I am.  If I can do this, you guys can do this."

15          (Video playing)

16          MR. KONIG:  I appreciate the Court's indulgence

17   while going through these videos.  I think that it makes --

18   this defendant went from the comfort of her hotel room to

19   the Capitol.  She said she was going to go into the Capitol,

20   and she did.  And when leaving, she stated, "This is war,"

21   and her -- the passerby said, you know, "In this war

22   traitors will be shot.  Pence, we're coming for you."

23          Your Honor, when considering this defendant and

24   her crime, its seriousness, to deter her and to deter the

25   people she's saying to be brave like her, the government

1   believes that a sentence of imprisonment is appropriate.

2   This defendant is certainly not being singled out for her

3   views, for advocating for her preferred presidential

4   candidate or for making her voice heard.  Her husband and

5   her friend did that on January 6th, and when the time came,

6   when they saw what was unfolding at the Capitol Building,

7   they stayed in the hotel room.  They did not go out and do

8   what the Court has seen today.

9          This defendant admits that she violated the law,

10  and I think the Court has gotten a pretty good view of the

11  contours of how she violated the law that day and what her

12  state of mind was.  And so the government believes a

13  sentence of 60 days of incarceration would be appropriate,

14  that it would not -- it would not, as defendant argues, be

15  draconian, but it would be consistent with the gravity of

16  the offense that she committed and would be consistent with

17  what's happening to similar and dissimilar people who

18  committed this crime and others on January 6th.

19          And I thank you, Your Honor.

20          THE COURT:  Let me just ask, is it your position

21  that she then disseminated these various tapings to others?

22          MR. KONIG:  She certainly did.  We know from some

23  of the videos and how we received them, when they were

24  submitted to the FBI, that at some points she had, I

25  believe, a handful of hundred viewers -- I think it was

1   350 -- and that some of her videos had had as many as 5,000

2   views at the time they were shared with the FBI.

3                THE COURT:  Thank you.

4                Defense counsel, you may proceed.

5                MS. AMATO:  Your Honor, I want to just sort of

6   follow up with that last piece.  I'm not sure if I'm

7   understanding that we know for sure that 5,000 different

8   people actually watched her videos versus, let's say, one

9   person watching 10, 20 times.  So I don't know if the

10  government knows that, or if they just -- all they can say

11  is that there were 5,000 views.

12               I mean, I can put something up on Facebook, and

13  I can have a friend watch it 20 times, and it will show

14  that 20 times it has been viewed, but that's a little

15  different --

16               THE COURT:  I don't think -- it's not the number

17  that concerns me, because you're right, I can't really

18  discern how many people would have, you know, actually seen

19  it.  But the fact that it would be disseminated to others is

20  what I find concerning.

21               MS. AMATO:  Well, Your Honor, I will say this.  My

22  understanding is that this was the first time that she's

23  ever live streamed anything, and I think she -- I've heard

24  her actually say that in these recordings that the

25  government has played.  The government's played portions of

1    some of these recordings, and she has said this is the first

2    time she live streamed anything.  And my understanding is

3    that the purpose of that was because she wanted -- she was

4    concerned that people wouldn't see what she was seeing, and

5    she was concerned that maybe media would distort things

6    later on, and so here she has this video of what she

7    actually saw.

8         So I don't think there was necessarily a bad

9    intent on her part by filming and doing the live stream.  I

10   think it was more she wanted to make sure that people

11   actually saw the reality of it.  You know, good or bad, but

12   that's the reality.  So that's --

13        THE COURT:  It's a reality I don't understand why

14   somebody would want to share with somebody else, but...

15        MS. AMATO:  I think she felt that the media

16   sometimes puts a spin on things, and so she wanted people to

17   be able to -- I guess she thought that what she was going to

18   encounter might be something that would be put out in a

19   different format through the media.  That's my

20   understanding.  So she wanted it to be shown that this is

21   what was actually happening.

22        Your Honor, through the sentencing pleadings

23   that I filed with the Court and the attachments to include

24   Ms. Acosta's letter, I hope the Court is able to see the

25   type of person Ms. Acosta really is.

1          She's not a violent person.  She's the antithesis

2     of violence.  Everything that she enjoys doing, her hobbies,

3     are all peace, about peace and harmony.  She does yoga

4     healing, herbal tee, Reiki, self-care.  I included the

5     photos of her house, Your Honor, that were taken at the time

6     of the search and arrest to also show that she embraced

7     philosophies of tranquility and nonviolence in her home

8     through the statutes that she had of Buddhas and different

9     types of, again, self-healing and peaceful meditative type

10    of pieces in her home and the way her home is set up.  So

11    when she went -- she made the decision to go to the Capitol,

12    she did not do so to commit violence.

13          And let's not forget that she did come to D.C.

14    with her husband and a friend.  They all came to watch

15    Former President Trump speak at the rally; and after he

16    spoke, they left.  That's what they came to do, and that's

17    when they left -- and that's what they saw, and they left to

18    go back to the hotel.

19          She saw some things on TV.  She made a bad mistake

20    in deciding to leave the hotel -- the comfort of the hotel,

21    as the government alludes to -- but had she really realized,

22    at the time that she made that decision, that things were as

23    bad as they were or were going to be as bad as they were,

24    she wouldn't have gone.  Her husband certainly would not

25    have let her go to the Capitol by herself and potentially be

1    put in harm's way.

2         Now --

3         THE COURT:  Let me just stop you there.  I mean, I

4    find that, you know, interesting; that considering what was

5    being broadcast, that she wouldn't have realized that there

6    was violence taking place and total chaos taking place.  But

7    even if she didn't see that on the TV and therefore that was

8    not the incentive for her to go down to the Capitol, once

9    she got to the Capitol and the things that she obviously was

10   live streaming, you know, she clearly would have realized,

11   once she got there, that this was a situation, it seems to

12   me, if she was a peace-loving person, she wouldn't want to

13   be involved in.  She would have turned around and went right

14   back to that hotel and got away from that as soon as

15   possible.

16        MS. AMATO:  You're right, Your Honor, and

17   that's -- it's hard to understand why, when she got there,

18   and she saw what she saw -- I mean, clearly she saw violence

19   going on.  She saw the window being broken, and then she

20   goes in.  She was surrounded by people who were saying

21   various things, and she repeated many of these things that

22   they said.  And so frankly, I think what really happened is

23   then she kind of got wrapped up and caught up in the fervor

24   of everybody else.

25        But she was not the one that started it.  She was

1    not the one that really -- I mean, she just got caught up in

2    everything, quite frankly, and she agrees that when she

3    looks back at everything that she should have left.  She

4    should never have gone, number one; and number two, when she

5    saw what was going on, she should have left.  And that was

6    the biggest mistake that she's made regarding all of this.

7         But, yes, it's -- for everything that I've seen of

8    her, including the letters that people have written -- but

9    I've also had a chance, over these many months, to talk with

10   her and get a better understanding of who she is -- that

11   person is very -- is not the kind of person you would expect

12   to stay at something like this.

13        But, again -- and she admits -- she got caught up

14   in the rapt and the fervor of everything around her, and she

15   had a lapse of judgment.  She really did.

16        Now, in terms of her entering the room, of

17   course -- I mean, she's not denying any of this.  She --

18   again, she got caught up in everything, but I do think that

19   part of her reason for going in there was a certain

20   curiosity.  As we saw in the clip that the government

21   provided that someone else had filmed, we see her with her

22   hand out holding her camera, and she's going around filming

23   what she saw.

24        She did leave.  She didn't stay in for very long,

25   not more than probably two minutes, and she -- to her

1    credit, she didn't try to go into any other room in the

2    Capitol.

3            As we saw in that clip the government provided,

4    there was an open room that people were going in and out.

5    There was that woman on that bullhorn who was talking to

6    people and giving them instructions and also telling them of

7    different ways to go to this place and that place in the

8    Capitol.  She didn't follow through with any of that.

9            So to her credit, she saw, she walked out, and she

10   didn't try to go back in the Capitol at all.  She didn't

11   touch any of the furniture.  She didn't do any -- she saw

12   what was going on, and she left.  She didn't want any part

13   of that violence that she saw other people were doing.

14           And as I explained in my sentencing memorandum,

15   there is a clip that I want to play in which the woman with

16   the bullhorn is telling people to stay there, to help the

17   patriots, and it's at that point that Ms. Acosta says I'm

18   out of here.  So I'm just going to see if I can play that

19   for the Court, and also if it can be heard.  Let's see.

20           (Pause)

21           Here we go.  Sorry.  Let me see if I can share my

22   screen.

23           Okay.  My screen -- for some reason this set-up is

24   not showing me what some of the other Zoom screen set-ups

25   show, and I'm not sure how to share it with the Court.  I

1    don't know, if I play it, if the Court can hear it.

2              (Video playing)

3              MS. AMATO:  Can the Court hear?

4              THE COURT:  Yes.

5              MS. AMATO:  Okay.  I'll just play the video.

6              (Video playing)

7              MS. AMATO:  So Ms. Acosta did not stay to help the

8    patriots.  She did leave when she finally realized that this

9    was not for her, and it was getting out of control.

10             Quite frankly, a sentence of jail time would cause

11   an unwarranted disparity in the sentences.  I looked through

12   the list.  The government has provided a list of all the

13   people who have been sentenced at this point, and I believe

14   I counted about 48 people who -- and which means basically

15   the majority of the people who have pled to this same

16   offense as Ms. Acosta have not received jail time, but have

17   received some kind of a probationary period with home

18   confinement.

19             The government had, in their pleading, mentioned a

20   couple of individuals who they -- who were sentenced to jail

21   time because they felt the Court should consider them, and

22   in my response I outlined the differences and the greater

23   actions that those other individuals were involved in.  And

24   there's clearly a big difference between those other

25   individuals and Ms. Acosta's actions, and those are not

1  appropriate sentences to consider based on those individuals

2  who were sentenced to jail time.

3       For purposes of the 3553(a) factors, there's

4  certainly no need for jail time to deter Ms. Acosta.  Again,

5  she's recognized her mistakes.  She never wants to get

6  involved in something like this again.  She's clearly stated

7  that in her letter.  She does apologize, and she's already

8  suffered a lot herself personally.

9       As I explained in my sentencing memorandum, her

10  husband, when they went back to California, his family and

11  he had been -- her husband had been working for the father's

12  family business.  When they learned that they had come to

13  Washington, and that she was there, at that point he lost

14  his job.  His father fired him.  He's been shunned by the

15  family.  His family doesn't want to have anything to do with

16  him, and so now, at 61 years old, he finds himself without

17  employment.  They moved out of state because of financially

18  how they've been affected.

19       I mean, it's just been one thing after another, so

20  she has already suffered a lot.  So number one, she's

21  suffered a lot.  Number two, she understands her mistakes in

22  this case.  Her whole life has basically changed because of

23  her involvement that day.

24       As to her personal life, she's had -- she had a

25  good life before her involvement in this case, although it

1    certainly took a lot for her to get there.  She is

2    originally from Mexico.  She's been in the United States

3    since she was two years old.  She's had various tough times

4    in her life, including her first marriage, which was

5    abusive, and then, when she did get divorced, she lost

6    custody of her children.

7            So she's had a lot of issues she's dealt with in

8    her life, and she's still working through some of the

9    traumas, but she's never been involved in criminal conduct

10   before.  She doesn't have prior arrests.  I mean, this is

11   her first and only offense.  So she is definitely not

12   someone that the Court is going to see and does not need

13   jail time in terms of deterrence.

14           She personally never really intended to hurt

15   anyone on January 6th.  She came to the Capitol with her

16   peace flag to spread peace.  But unfortunately she got

17   caught up in the fervor around her, and it was not until she

18   was able to distance herself a little bit from the events

19   that occurred as she was walking away that she remembered

20   her intentions were for peace and recognized the gravity of

21   what took place.

22           And I wanted to play another video, and I guess

23   I'll just -- well, the point of playing this is not only to

24   hear her words, it also shows her again with her peace flag,

25   although we've seen her peace flag in some of the videos the

1    government had played.  But I'll just play this part anyway.

2            (Video playing)

3            MS. AMATO:  So that, again, brings her back to who

4    she really usually is.

5            In terms of some of the words, again, I've

6    mentioned she got caught up in the rapture of what other

7    people were saying around her in the events.  She tried to

8    explain in her sentencing memorandum why she said some of

9    the words she said, like "the best is yet to come."  That is

10   more a saying of hope.

11           But, anyway, Your Honor, we would ask the Court --

12   we would ask the Court to place her on probation with home

13   confinement or some other conditions, but we really believe

14   that, as to her, imprisonment would be a harsh sentence

15   that's unwarranted, and her involvement in this case was

16   very abhorrent.

17           THE COURT:  What about general deterrence?  I

18   mean, what do we do in a country as great as America that's

19   declining because we've got this unfortunate divide and this

20   partisanship that now seems to be controlling?  I mean, what

21   message do you send to others who have the same mindset;

22   that if you engage in what was an attempt to undermine our

23   governmental process, that there's not really a consequence

24   for it?

25           MS. AMATO:  Well, there is -- I mean, there's been

1    consequences.  Again, irrespective of what Your Honor does

2    here, her whole life has changed.  They moved from

3    California, from this very comfortable life, which was

4    basically taken right underneath of their feet because --

5              THE COURT:  I'm sorry, I don't mean to cut you

6    off, but I guess my question is, I mean, that's not

7    information that society's going to know about, what has

8    happened to her personally as far as her personal life is

9    concerned.  What society will know is that, you know,

10   despite all that occurred as far as she is concerned, that

11   she got no real sanction from the Court in reference to it.

12             MS. AMATO:  Well, Your Honor, she's -- well,

13   whether people hear about that or not -- I mean, the media

14   seems to write about everybody who gets sentenced and

15   provides some information about that individual's

16   background.  But even if they don't talk about how she has

17   lost everything and had to move and this, that, and the

18   other, and those repercussions and the stress of all that's

19   been involved and health issues, they know that she has been

20   under the Court's supervision for almost a year now, or a

21   year, basically.  She has had certain requirements to do

22   pursuant to that.

23             She's now faced with sentencing.  She's faced with

24   the stress of all this.  And a sentence of home confinement,

25   a sentence of probation with conditions, does still indicate

1    to people that there are repercussions, that the Court is

2    not just -- I mean, first of all, the government has charged

3    these people, so, first of all, they recognize that there's

4    that issue.  And then there's the possibility of any kind of

5    sentence and a lack of their own ability to just freely go

6    about their life.

7          So there are repercussions and sanctions just by

8    being charged and then by being sentenced, even with home

9    confinement, even with probation.

10         THE COURT:  Very well.

11         Does your client want to say anything?

12         MS. AMATO:  I think she does, Your Honor, yes,

13   although she did provide the Court with a rather extensive

14   letter.

15         THE COURT:  Yes, I did read it last night.

16         MS. AMATO:  Thank you.

17         THE DEFENDANT:  Your Honor, I don't glorify my

18   actions, and I admit that what I did was not right.  I got

19   caught up on the energy, and if I could go back and change

20   things over, I definitely would have brought more peace,

21   definitely more love.

22         And I'm not excusing my actions because there's

23   no excuse, but I know if I could just do things all over

24   again -- and I got caught up in all the energy of what was

25   going on, what others were saying and doing -- I definitely

1     would change things so much.

2            My actions and what I had said there, like I said,

3     I don't glorify them, but I wish I could just do things

4     different, and I wish I could have said and yelled and

5     screamed more about love, more about peace, because that's

6     what we need as humans.  We -- there's no need for war if we

7     only just spread love, and that love comes within us.  Until

8     then, we will not know peace because there is no peace if

9     we're fighting a war inside us.

10            I just want to spread love and peace to the world.

11    That's what I want.  That's my vision to humanity.  We need

12    to stop there.  We don't need war against each other.

13            Find --

14            THE COURT:  That day you seemed to be calling for

15    war.  You say you're a peaceful person, but you were making

16    statements that seemed to be calling for war.

17            THE DEFENDANT:  Yes.  And you're right, because

18    that's what I saw people were just fighting and saying

19    things, and I got caught up on the energy of just how

20    everything just was that way.  I just couldn't believe it.

21    I couldn't believe what was really going on.

22            THE COURT:  But you -- wait a minute.  You're not

23    suggesting that those statements that you made were a

24    rejection of what was taking place.  That didn't seem to be

25    the case.  You seemed to be all in.

1          I mean, I don't understand what you're saying.

2     You seem to be saying now that you were rejecting what was

3     taking place, but your comments are totally inconsistent

4     with that, and you seemed to be buying in on there being

5     future violence.

6          THE DEFENDANT:  Like I said, Your Honor, I got

7     caught up on the energy, what was going on.  I am very

8     empathic, and sometimes when I get these energies, I get --

9     it's like it sucked me in, and it's not who I am.  And I was

10    just so -- just so in disbelief to what was happening.

11         And you're right, Your Honor.  I mean, if I could

12    turn things around, I would, but usually, in all the rallies

13    that I have gone, I've always spread love and laughter and

14    peace.  I never, in all the other rallies, have ever gotten

15    to the point that -- what was going on there.

16         All I wanted was just to report what was going on.

17    And it's like this dark energy, this just force just sucked

18    me into this.  And it's not anything what I am and what I

19    stand -- who I am.

20         THE COURT:  I'll be very honest.  In reference

21    to -- there were two things in your statement that I found

22    concerning and, it appeared to me, possibly an attempt to

23    try and manipulate this Court.

24         You indicated that when you were detained that you

25    developed some energy, I guess, or whatever, affection, for

1   some woman, but then you maintained it was a woman of color.

2   I don't understand why that was of significance.  It seems

3   to me that it makes no difference what color somebody is.

4   If you feel sympathy for them, so what?  What does color

5   have to do with it?

6        And you also said outside the Capitol that day

7   that you had interaction with someone, and she was a person

8   of color.  I just -- I'm sort of perplexed as to why you

9   thought the color of somebody would be relevant to those two

10  statements.

11       THE DEFENDANT:  No, and there's no -- there's no

12  reason for that.  It's specifically bringing up someone, you

13  know, that was really beautiful who helped me and gave me a

14  kiss on my forehead.  I don't know exactly how she looked

15  because she was covered, and I just said like to identify

16  the person -- identify the person that way.

17       It's like if someone was Asian or Mexican, I

18  identify how beautiful that this person is no matter -- I

19  don't -- no matter what nationality, no matter what color,

20  no matter what religion.  What matters is what you are on

21  the inside because the outside of your status, all of those

22  things, are nothing.  What matters is what you are, which is

23  love.

24       It's like I said, I don't see -- I don't see any

25  other difference of people, but I just read into their

1      energy of the God source, and I just identify it that way,

2      Your Honor.

3              THE COURT:  The other thing that concerned me -- I

4      mean, I think it was clear to anybody who was at the Capitol

5      on that day, or who watched it on TV, that, you know, these

6      people who were doing the things that were going on that day

7      were Former President Trump supporters, but you represented

8      that these acts were being committed by Antifa and Black

9      Lives Matter people.

10             Now, I don't condone violence by anybody, but that

11     was very concerning, as to why you would try and blame

12     somebody else for what obviously was not the case.

13             THE DEFENDANT:  I have said, when I had mentioned

14     that when other people were repeating what they were saying,

15     they said that it was Antifa or BLM or --

16             THE COURT:  But you had your own eyes.  You had

17     your own eyes to see what was going on.

18             THE DEFENDANT:  Yes.

19             THE COURT:  What would have caused you to repeat

20     something that somebody else said that obviously was false

21     considering what you had to have seen and observed?

22             THE DEFENDANT:  Yes, like I said, I was just

23     repeating what others were saying.  But what I saw there was

24     everything, and, you know, other people, I don't know.  I

25     don't know a hundred percent if that was either patriots or

1    BLM or Antifa.  I don't -- I can't.  I think it was just a

2    mix of everybody who got caught on into the energy honestly.

3    That's my honest opinion.

4          I'm not saying that all patriots are good because

5    definitely not all of them stand for good.

6          THE COURT:  And then you made a statement, "We're

7    taking our Capitol back."  Who do you think you were taking

8    your Capitol back from?

9          THE DEFENDANT:  Well, I was just repeating what

10   other people were repeating, and that just came out.  I

11   don't know what we were taking the Capitol from.  It was

12   just something that was repeating from other people.  I

13   don't have no idea, Your Honor.

14         THE COURT:  Okay.  Anything else?

15         MS. AMATO:  No.  Thank you, Your Honor.

16         THE COURT:  I mean, I have -- I mean, these cases

17   are difficult because, on the one hand, most of the people

18   who got caught up in this situation don't have prior records

19   and seem to have lived decent lives before whatever caused

20   them to develop the mindset to do what they did on January

21   6th.

22         On the other hand, it's very troubling to me that

23   we have people in our country who, when there's an election

24   and they don't get their way, that they act out in the

25   manner that we saw take place on January 6th.  I mean, what

1   happens next time around?  Will it be justified if whoever

2   the Democratic candidate is runs and loses -- and that's

3   always a possibility -- that the Democratic supporters would

4   then say, well, we think the election was stolen and strike

5   out as the former president's constituents did?  I mean,

6   that's leading us to a very dangerous place.

7         And, you know, I've been reading a couple of books

8   about how civil wars start, and so much of history is

9   repeating itself in our country.  And the things that have

10  happened in other environments that have caused a

11  destruction of democracy, those same type of things are now

12  happening here in America because we've got a segment of our

13  society that feels that it has to be their way and no other

14  way.  A democratic society can't function that way because

15  in a democratic society somebody's going to win and

16  somebody's going to lose.  And historically, while people

17  may not have been happy about having lost, they accepted

18  that reality.

19        But now this mindset is that we didn't get our

20  way, and because we didn't get our way the election had to

21  be rigged, and therefore that justifies the things that took

22  place on January 6th.  Because, Ms. Acosta, I must say,

23  contrary to what you're saying now and contrary to what you

24  said in your letter, you were there for an extended period

25  of time.  You seemed to be gleeful.  You seemed to be happy

1    about what was going on.

2              You did not seem to be a peace-loving person.  You

3    seemed to be someone who was seeking to inspire others to do

4    what you thought you had done.

5              You made a statement to the effect that, you know,

6    you were brave enough to do what you did; and, therefore,

7    others should be brave enough to do the same thing.  I mean,

8    what kind of message does that send to people who may have

9    the same mindset that you had that day?  I mean, that's a

10   very troubling situation for this country to be

11   experiencing.  It's concerning to me.

12             I love this country.  This country has been good

13   to me.

14             THE DEFENDANT:  I just --

15             THE COURT:  And to see what people are trying to

16   do to this country for their own partisan-biased

17   perspectives is just very concerning.

18             THE DEFENDANT:  Yes.

19             THE COURT:  And I just don't know the message that

20   you sent.  I don't know.  Maybe you've learned your lesson.

21             THE DEFENDANT:  I did, Your Honor.

22             THE COURT:  You know, maybe it's something that

23   you would not repeat.  But the concern I have is what

24   message did you send to others?  Because unfortunately there

25   are a lot of people out here who have the same mindset that

1    existed on January 6th that caused those events to occur.

2    And if people start to get the impression that you can do

3    what happened on January 6th, you can associate yourself

4    with that behavior and that there's no real consequence,

5    then people will say why not do it again.

6             Now, I've given people probation, but the people

7    I've given probation who were there, what they did was

8    wrong, but all they did was go in.

9             THE DEFENDANT:  Yes.

10            THE COURT:  There's no indication they were

11   seeking to try and disseminate what they did to other

12   people.  They might incite other people.  That's a different

13   situation, from my perspective.

14            Maybe other judges think differently, but it seems

15   to me that just -- yes, somebody just happened to be there,

16   got caught up in the event.  They just walked in, they

17   looked around, and they turned around and left.  That's one

18   thing.  I don't think that person should have to go to jail.

19            But for somebody who, for as long of a period as

20   you were there and made the statements that you made --

21   which you now are saying, which I just don't accept, that

22   you were just repeating what somebody else said -- that was

23   not the impression I got from observing you and what you

24   were doing in your facial expressions.  Those were your own

25   statements.  Those were not statements that you were just

1    repeating because somebody else said it.

2              That's my view based upon my observation of what I

3    saw, and I just don't believe what you're saying is truly

4    what was in your mind and why you said those things at that

5    time.

6              So it's difficult because there are a lot of

7    things I have to take into account.  I have to obviously

8    take into account the nature of the conduct that you engaged

9    in.  And I consider it to be very serious, problematic

10   conduct that you engaged in because, like I say, it just

11   sends a bad message about what we, as Americans, should do

12   when our candidate of choice does not win.  And, you know,

13   what occurred on January 6th just totally undermines a

14   governmental process predicated on the peaceful transfer of

15   authority.  It just can't exist.

16             And, again, I think a message has to be sent to

17   others that there are consequences, and, you know,

18   considering all the factors I have to consider in deciding

19   what the appropriate penalty is in this case, it is my view

20   that in order for people to understand that if you're going

21   to engage in the type of behavior that you engaged in, if

22   you're going to make the statements that you made on that

23   day in reference to what was occurring, and if you're going

24   to then disseminate that information to others, there has to

25   be a penalty for it.

1          So I would conclude under the circumstances that a

2    sentence of 45 days in jail is an appropriate sentence in

3    this case, and I will also fine you $5,000.  And you also

4    have to pay $10 to the court as a special assessment.  I'll

5    give you 30 days, based upon the money that you have

6    available according to the probation department.  I'll give

7    you 30 days to pay that $5,000 fine and also the $10 court

8    assessment.

9          I was of the impression previously, but I think

10   I've been convinced otherwise by a ruling by Judge Kotelly

11   and just a review of the statute itself, that if this is a

12   petty offense -- and I think it is a petty offense -- that a

13   period of probation is not appropriate, so I won't impose a

14   period of probation.

15         You do have 14 days from today's date to appeal

16   your sentence to a higher court.  If you can't afford to pay

17   the cost of letting that court know that you want to appeal,

18   that will be paid free of charge by the government.  And if

19   you cannot afford to pay for a lawyer, that will be paid

20   free of charge by the government.

21         Anything else from probation?

22         THE PROBATION OFFICER:  No, Your Honor.  Thank

23   you.

24         THE COURT:  Does she need to contact you to

25   discuss self-surrender?  Because I will permit her to self-

1   surrender once they designate a facility for her to serve

2   her sentence.

3           THE PROBATION OFFICER:  Your Honor, I will get in

4   touch with Ms. Acosta after the hearing and give her the

5   instructions for voluntary surrender.

6           THE COURT:  Very well.

7           Ms. Acosta, you will receive a notice from the

8   Federal Bureau of Prisons as to where you're to serve your

9   45-day sentence, and once you are notified, you will have to

10  report.  If you don't, a warrant will be issued for your

11  arrest.

12          Anything else from government counsel?

13          (Pause)

14          THE COURT:  I can't hear you.

15          MR. KONIG:  I apologize.  The government moves to

16  dismiss the remaining counts of the information or

17  indictment in this case.

18          THE COURT:  Oh, I assume there's no objection.

19  That will be granted.

20          Anything else from defense counsel?

21          MS. AMATO:  Your Honor, I would just ask for 60

22  days for her to pay the fine, please.

23          THE COURT:  Very well.  I'll give her 60 days to

24  pay the fine.

25          MS. AMATO:  Thank you.

1          THE COURT:  If nothing else, thank you.

2                  (Whereupon the hearing was

3                  concluded at 10:27 a.m.)

4

5          **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7              I, LISA A. MOREIRA, RDR, CRR, do hereby

8     certify that the above and foregoing constitutes a true and

9     accurate transcript of my stenographic notes and is a full,

10    true and complete transcript of the proceedings to the best

11    of my ability.

12        **NOTE:**  This hearing was held remotely by Zoom or some

13    other virtual platform and is subject to the technological

14    limitations of court reporting remotely.

15                  Dated this 5th day of April, 2022.

16

17                              /s/Lisa A. Moreira, RDR, CRR

18                              Official Court Reporter
                                United States Courthouse
19                              Room 6718
                                333 Constitution Avenue, NW
20                              Washington, DC 20001

21

22

23

24

25